Date Signed:
October 17, 2013



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>THE MORTGAGE STORE,<br><br>      Debtor. | Case No. 10-03454<br>Chapter 7 |
| DANE S. FIELD,<br><br>      Plaintiff,<br><br>  vs.<br><br>DAVID A. PARKER and VELMA PARKER,<br><br>      Defendants. | Adv. Pro. No. 12-90050<br><br><br><br>Re: Docket No. 20 |

## MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This motion requires me to determine whether a transfer from the debtor, The Mortgage Store, Inc. ("TMS"), to defendants David and Velma Parker was fraudulent and is recoverable by the plaintiff trustee. I conclude that the transfer was fraudulent under the Bankruptcy Code and the Hawaii Uniform Fraudulent Transfer Act.

**I.  FACTS**

In 1996, TMS started business as a mortgage brokerage firm. George W.

Lindell was the sole shareholder and president of TMS from 1996 through 2008. (He purportedly sold the company to his daughter, Holly Hoaeae, in 2008, but continued to play a substantial role in the company's business.)

In 2005 or 2006, TMS began making direct loans to borrowers, using money borrowed from individual investors at relatively high interest rates. TMS's cost of borrowing exceeded the yield on its loans and investments. As early as September 2006, TMS was able to repay its debts only by borrowing more money. In other words, TMS's business had degenerated into a Ponzi scheme. By June 30, 2007, TMS was insolvent.

In 2005, Mr. Parker and Mr. Lindell purchased a parcel of real property in Maui for $1,300,000.00. Each individual acquired a 50 percent undivided ownership interest. (Later, the parties signed a deed that added their wives to title.) The parties paid $665,010.50 in cash and borrowed $650,000.00 from First Hawaiian Bank ("FHB") to pay the balance of the purchase price and closing costs. The parties thereafter divided the property by converting it into a two-unit condominium. In May 2008, they split up the property by conveying one unit to each of themselves.

Mr. Lindell paid more than his share of the debt service on the FHB loan and the cost of dividing and improving the property. Mr. Parker agreed that he

2

would reimburse Mr. Lindell for these excess payments, but the parties did not agree on a specific sum.

On May 13, 2008, the Parkers signed a $575,000 promissory note in favor of TMS. At about the same time, the Parkers signed a mortgage in favor of TMS encumbering their unit. These documents were fabricated. TMS never lent any money to the Parkers (except for a smaller amount described below). Mr. Parker and Mr. Lindell concocted these false documents because the Parkers intended to apply for a new loan from FHB so the Parkers could repay Mr. Lindell. Mr. Lindell and Mr. Parker probably believed that FHB was more likely to give Mr. Parker a loan on favorable terms if FHB thought that Mr. Parker was refinancing an existing indebtedness.

FHB agreed to lend Mr. Parker $562,500.00. This created a problem because FHB insisted that the Parkers pay off the TMS "loan" at closing and the unpaid balance of the fictitious "loan" by TMS was greater than FHB's loan amount.[1] To solve this problem, TMS deposited $33,714.90 in the escrow account created to close the FHB loan. In other words, TMS lent the Parkers money so the Parkers could "repay" a fictitious prior loan from TMS.

---

[1] As is noted above, FHB had made a loan to Mr. Lindell and Mr. Parker when they bought the property. That loan had apparently been paid off before FHB agreed to make the "refinancing" loan.

3

The FHB loan closed and the escrow disbursed $584,033.02 to TMS in repayment of the fictitious loan. The check was dated August 28, 2008, and was deposited in TMS' checking account the next day. By this time, as is noted above, TMS was insolvent. TMS continued to receive and disburse money through its checking account. From September 8 through September 10, 2008, the account had a zero balance.

At some point, Mr. Lindell and Mr. Parker agreed on the amount of Mr. Lindell's excess contributions to the property. Based on this agreed amount, the proceeds of the FHB loan which were remitted to TMS at Mr. Lindell's direction were greater than the amount which Mr. Parker owed to Mr. Lindell. In order to refund the excess to Mr. Parker, Mr. Lindell caused TMS to issue a check to the Parkers in the amount of $151,415.91. The check was dated September 2, 2008, and cleared TMS' account on September 12, 2008.

On November 12, 2010, TMS filed a voluntary petition for chapter 7 relief under the Bankruptcy Code and Dane S. Field was appointed trustee. The trustee commenced this adversary proceeding on April 30, 2012, alleging that the transfer to the Parkers on September 12, 2008, was fraudulent under the Bankruptcy Code and the Hawaii Uniform Fraudulent Transfer Act.

4

## II. STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), Fed. R. Bankr. P. 7056; see also Barboza v. New Form, Inc. (In re Barboza), 545 F.3d 702, 707 (9th Cir. 2008). In resolving a summary judgment motion, the court does not weigh evidence, but rather determines only whether a material factual dispute remains for trial. Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 834 (9th Cir. 1997). In making this determination, the court views the evidence in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in favor of the nonmoving party. McSherry v. City of Long Beach, 584 F.3d 1129, 1135 (9th Cir. 2009).

A respondent can object to a motion for summary judgment on the ground that "the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). If a respondent makes this objection, "the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated [at trial]." Id. advisory committee's note (2010). "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is

5

whether it could be presented at trial in an admissible form." Gannon Int'l, Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012). "At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).

## III. DISCUSSION

The trustee seeks partial summary judgment on his claims that the transfer to the Parkers was fraudulent under the Bankruptcy Code, 11 U.S.C. § 544(b)(1) (2006), and the Hawaii Uniform Fraudulent Transfer Act, Haw. Rev. Stat. § 651C-4(a)(1) & (2) (2009).

### A. Trustee's Right to Avoid Transfers

Under section 544(b)(1), the plaintiff trustee succeeds to the rights of an actual unsecured creditor existing at the commencement of the case and has the authority to prosecute that creditor's state law fraudulent transfer actions. The trustee need not identify a specific unsecured creditor, as long as an unsecured creditor exists. In re Appleseed's Intermediate Holdings, LLC, 470 B.R. 289 (D. Del. 2012); In re Leonard, 125 F.3d 543, 544 (7th Cir. 1997). Many creditors have filed unsecured claims in the underlying bankruptcy case. See Bk. Case No. 10-03454, Cl. Reg. The trustee, therefore, has the authority to challenge the

6

alleged transfers under applicable state law.

B. <u>Elements of Fraudulent Transfer</u>

The Hawaii Uniform Fraudulent Transfer Act permits the trustee to avoid

> A transfer made or obligation incurred by a debtor [that] is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Haw. Rev. Stat. § 651C-4(a).

　　　　1. *Transfer of the Debtor's Property*

The Parkers contend that the fraudulent transfer statute does not apply because there was no "transfer" within the meaning of the statute. A "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or interest in an asset, and

7

includes a payment of money, a release, a lease, and the creation of a lien or encumbrance." Haw. Rev. Stat. § 651C-1. To be subject to avoidance as a fraudulent transfer, a transfer must be of a debtor's interest in property. Taylor Associates v. Diamant (In re Advent Management Corp.), 178 B.R. 480, 486-87 (B.A.P. 9th Cir. 1995); Danning v. Bozek (In re Bullion Reserve of North America), 836 F.2d 1214, 1217 (9th Cir. 1988). The Parkers argue that they transferred the proceeds of the FHB refinancing loan to TMS at Mr. Lindell's request, pending a determination of exactly how much the Parkers owed to Mr. Lindell. The Parkers also argue that TMS was merely holding the money on behalf of Mr. Parker and Mr. Lindell. As such, according to the Parkers, TMS did not own the funds, and the transfer was not of an interest in property belonging to TMS.

This argument, however, ignores the fact that FHB issued the funds to TMS to repay the purported note and mortgage executed by the Parkers. Dkt. no. 32, Exhibits C & D. If the note and mortgage are genuine documents, then TMS was entitled to the money as repayment of the Parkers' debt, and TMS was not holding the money for the Parkers.

In order to establish that TMS was holding the money for them, the Parkers must first show that the loan documents they signed were fictitious. I offered the

U.S. Bankruptcy Court - Hawaii   #12-90050   Dkt # 51   Filed 10/17/13   Page 8 of 17

Parkers an opportunity, in post-hearing briefing, to discuss and explain the loan documents they signed in favor of TMS, but they failed to address that subject. (Mr. Parker filed a declaration in which he generally denied intending to defraud anyone, but he does not explain why he signed documents purporting to evidence a loan that did not exist or why he gave those documents to FHB when he applied for a loan from that institution.[2]) Thus, nothing in the record contradicts the trustee's proof that TMS never made such a loan to the Parkers and that the Parkers signed the loan documents for the purpose of deceiving FHB.

Even if the Parkers could overcome this obstacle, they cannot show that the money which TMS paid to the Parkers is traceable to the money the Parkers borrowed from FHB. The trustee proved that TMS made a transfer to the Parkers from its general bank account. As such, there is a presumption that the funds were property of the debtor's estate. In re Advent Management Corp., 178 B.R. at 492. To overcome this presumption, the Parkers must prove that: (1) a constructive trust existed prior to the debtor's bankruptcy filing; and (2) they are able to trace the trust res into succeeding transfigurations. Id. at 488-89. The Parkers cannot trace the loan proceeds. The trustee has proved that, on September 8, 2008 – after

---

[2] His declaration says that Bank of Hawaii made the refinancing loan, but all of the documentary evidence, including documents which he produced to the trustee, state that FHB was the lender.

9

U.S. Bankruptcy Court - Hawaii   #12-90050   Dkt # 51   Filed 10/17/13   Page 9 of 17

TMS deposited the loan proceeds into its BOH account but before TMS made the transfer to the Parkers – the account reached a zero balance. None of the withdrawals made after that date can be traced to the FHB loan disbursement.

Thus, when TMS transferred money to the Parkers, it made a transfer which is potentially subject to avoidance.

    2.    *Actual Fraud, HRS § 651C-4(a)(1)*

The trustee has proved that, by late 2006, TMS was a Ponzi scheme. Courts presume that Ponzi scheme operators intend to hinder, delay, or defraud creditors. See, e.g., Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); Barclay v. Mackenzie, 525 F.3d 700, 704 (9th Cir. 2008). Once a Ponzi scheme is established, the bankruptcy trustee need only establish that transfers were made between certain years and for a total certain sum. In re Thomas, 47 B.R. 27, 31 (Bankr. S.D. Cal. 1984).

The Parkers argue that the trustee has not shown that the transfer they received was connected to the Ponzi scheme. They contend that they engaged in a separate real estate transaction with Mr. Lindell that had nothing to do with the TMS fraud. The evidence shows otherwise. The trustee has proven that, after TMS received the proceeds of the FHB refinancing loan, its bank account balance dropped to zero. TMS then deposited funds in the account, much of which came

10

U.S. Bankruptcy Court - Hawaii    #12-90050    Dkt # 51    Filed 10/17/13    Page 10 of 17

from investors who later suffered sizable losses due to the Ponzi scheme. TMS then used the bank account, and the investors' funds in that account, to pay the Parkers. The Parkers may not have known it at the time, but they undoubtedly received proceeds of the Ponzi scheme.

The trustee proved that TMS transferred at least $151,415.91 to the Parkers. Dkt. no. 21, Exhibit 3. The transfer is fraudulent under 11 U.S.C. § 544(b)(1) and Haw. Rev. Stat. § 651C-4(a)(1).

        3.    *Good Faith Defense*

The initial transferee of a transfer avoided under section 651C-4(a)(1) has an affirmative good faith defense: "[a] transfer . . . is not voidable under section 651C-4(a)(1) against a person who took in good faith and for a reasonably equivalent value[.]" Haw. Rev. Stat. § 651C-8(a). The Parkers, as initial transferees, bear the burden of establishing both of these elements. <u>In re Cohen</u>, 199 B.R. 709, 718 (B.A.P. 9th Cir. 1996); Uniform Fraudulent Transfer Act § 8(a) comment 1 ("The person who invokes this defense carries the burden of establishing good faith <u>and</u> the reasonable equivalence of the consideration exchanged.") (emphasis added).

        (a)    *Good Faith*

The Parkers claim that they acted in good faith in connection with the

U.S. Bankruptcy Court - Hawaii   #12-90050   Dkt # 51   Filed 10/17/13   Page 11 of 17

transfer. They deny any wrongdoing and any knowledge that TMS was a Ponzi scheme.

The Uniform Fraudulent Transfer Act does not define "good faith." The Ninth Circuit has held that a person does not take in good faith when, looking at objective facts, the circumstances would alert a reasonable person to the debtor's fraudulent purpose, and diligent inquiry would have discovered the fraudulent purpose. <u>Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)</u>, 916 F.2d 528, 535-36 (9th Cir. 1990).

The only indication of bad faith cited by the trustee is the Parkers' execution of the fictitious loan documents and their use of those documents to obtain the FHB refinancing loan. This conduct is far from praiseworthy, but generalized bad conduct does not negate good faith for fraudulent transfer purposes. The Parkers knew that Mr. Lindell was willing to create phoney loan documents and use them to deceive another lender. This knowledge would not necessarily have led a reasonable person to suspect that Mr. Lindell was running a Ponzi scheme or looting TMS. Genuine disputes of material fact preclude summary judgment for the trustee on the issue of the Parker's good faith.

      (b)    *Reasonably Equivalent Value*

For purposes of the fraudulent transfer statute, "value" is defined as

U.S. Bankruptcy Court - Hawaii   #12-90050   Dkt # 51   Filed  10/17/13   Page 12 of 17

property transferred or an antecedent debt secured or satisfied. Haw. Rev. Stat. § 651C-3. In determining reasonableness, value must be measured from the standpoint of the debtor. Reiser v. Hayslip (In re Canyon Systems Corp.), 343 B.R. 615, 639 (Bankr. S.D. Ohio 2006). When TMS transferred the $151,515.91 to the Parkers, the Parkers did not give any property to TMS, and TMS did not owe a debt to the Parkers which the transfer satisfied. The Parkers admit that they dealt only with Mr. Lindell, not TMS, and they do not claim that TMS owed them any money or had any independent liability to them. As such, TMS did not have any antecedent debt to the Parkers. The Parkers, therefore, gave no value to TMS in exchange for the transfer.

The Parkers argue that Mr. Lindell and TMS shared an identity of interests and that therefore value given to Mr. Lindell should be treated as value given to TMS. This argument must fail.

In the first place, the cases on which the Parkers rely do not support their argument. Ragan v. Tri-County Excavating, Inc., 62 F.3d 501 (1995), is not a fraudulent transfer decision and therefore has nothing to do with this case. In In re Royal Crown Bottlers, Inc., 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982), the debtor was a wholly-owned subsidiary of another corporation. The parent corporation had agreed to purchase some of its stock from one of its stockholders. The

13

subsidiary paid for the stock which the parent bought.  The debtor filed a chapter 7 petition and the trustee sought to recover the payment for the parent's stock.  The court observed that, when the consideration for a transfer passes to a third party, the transferor "ordinarily receives little or no value," but where the debtor and the third party "are so related or situated that they share an 'identity of interests,' . . . what benefits one will, in such case, benefit the other <u>to some degree</u>."  <u>Id</u>. (emphasis added).  The court noted that the nature of the relationship might matter: if a parent corporation pays its subsidiary's debt, the parent may be benefitted to the extent that the reduction of the subsidiary's indebtedness increases the value of the parent's interest in the subsidiary's stock; but if the subsidiary pays the parent's debt, the subsidiary usually will not benefit.  After discussing (but not deciding) which party had the burden of proving the amount of the benefit in such a situation, the court decided the case against the trustee "on a different evidentiary factor of a more fundamental nature."  The payment, which the trustee sought to recover, had come from an account in which funds of the debtor, the parent, and other affiliates were commingled.  The court ruled that the trustee had not proven a transfer of the debtor's property.  "[T]he trustee cannot recover, even if the defendant is held to have the burden of going forward with evidence to show lack of harm to the debtor's estate in circumstances such as are

14

found in this case." Id. The court's discussion of the issue of benefit, thus, is pure dicta. Even if it weren't, there is no reason to believe that TMS received any benefit when it paid its owner's (Mr. Lindell's) debt to the Parkers.

In the second place, Hawaii law does not permit "reverse piercing" of the corporate veil. See Chung v. Animal Clinic, Inc., 63 Haw. 642 (Haw. 1981); see also Suzuki v. Castle & Cooke Resorts, 124 Haw. 230 (Haw. 2010). In most cases, creditors of a corporation attempt to show that the corporation's shareholders should be liable for corporate debts. In this case, the Parkers must show that TMS should be held liable for the debts of its shareholder, Mr. Lindell. The Parkers are unable to do this because Hawaii law does not recognize reverse piercing, one of the exceptions to the general rule that a corporation is a separate entity from its shareholders.

    4.    *Constructive Fraud, HRS § 651C-4(a)(2)*

The transfer is also fraudulent under Haw. Rev. Stat. § 651C-4(a)(2). The trustee has demonstrated that: (1) TMS did not receive reasonably equivalent value, and (2) TMS was insolvent at the time of the transfer.

As is noted above, TMS got nothing of value in return for its transfer to the Parkers. The evidence clearly shows, and the Parkers do not deny, that TMS was insolvent well before TMS made the transfer to the Parkers.

15

C.   The Parkers' Liability

The trustee is able to recover the avoidable transfers from the Parkers pursuant to 11 U.S.C. § 550. This section provides that: "to the extent that a transfer is avoided under section 544 . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer . . . or any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a)(1).

The Parkers do not dispute that they are the initial, and only, transferees of the original transfer from TMS in the amount of $151,415.91.

D.   Prejudgment Interest

The court has discretion to grant prejudgment interest under state law on the fraudulent transfers from the date each transfer was made. In re Slatkin, 525 F.3d 805, 820 (9th Cir. 2008); In re Agricultural Research and Technology Group, Inc., 916 F.2d 528, 541-42 (9th Cir. 1990). Under Hawaii law, "[p]rejudgment interest is an element of complete compensation. Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." Kalawaia v. AIG Haw. Ins. Co., 90 Haw. 167, 172, 977 P.2d 175, 180 (1999); see also Molinar v. Schweizer, 95 Haw.

16

U.S. Bankruptcy Court - Hawaii   #12-90050   Dkt # 51   Filed  10/17/13   Page 16 of 17

331, 335, 22 P.3d 978, 982 (2001) (stating that "prejudgment interest compensates for the inevitable litigation delay in being reimbursed for damages incurred"). The purpose of prejudgment interest is to "allow the court to designate the commencement date of interest in order to correct the injustice when a judgment is delayed for a long period of time for any reason, including litigation delays." Leibert v. Fin. Factors, Ltd., 71 Haw. 285, 293, 788 P.2d 833, 838 (1990); Metcalf v. Voluntary Employees' Benefit Ass'n of Haw., 99 Haw. 53, 61, 52 P.3d 823, 831 (2002).

Hawaii state law applies when setting the appropriate interest rate. See In re Agric. Research & Tech. Grp., 916 F.2d at 541 ("State law regarding prejudgment interest is applicable via 11 U.S.C. § 544(b)."); In re Acequia, Inc., 34 F.3d at 818 n.4. The trustee should recover pre-judgment interest at the Hawaii rate of 10 percent per annum from the date on which the transfers were made. Haw. Rev. Stat. § 636-16; Donell, 533 F.3d at 772; Eastman v. McGowan, 86 Hawai'i 21, 28, 946 P.2d 1317, 1324 (1997).

\* \* \*

For these reasons, the trustee's motion for partial summary judgment is GRANTED.

17